WESTERN ELECTRIC CO. v. CAPITAL TELEPHONE & TELEGRAPH CO. et al.

(Circuit Court, N. D. California. March 29, 1898.)

No. 12,129.

1. PATENT—PRIOR INVENTION—MULTIPLE SWITCHBOARD.

The Firman patent, No. 252,576, for a "multiple switchboard for telephone exchanges," granted January 17, 1882, was not anticipated by the British patent, No. 4,903, issued to Scribner May 14, 1880; the evidence showing that Firman reduced his invention to practice before the first step was taken to secure the Scribner patent.

2. SAME—NOVELTY.

Claim 1 of the Firman patent, No. 252,576, for "the combination of two or more switchboards at the central office exchange system, to each of which the same telephone lines are connected, whereby any two of these lines may be connected together upon either of the multiple switchboards," is not void for want of novelty because of the prior state of the art, as shown in the British patent, No. 13,487, for a telegraphic dial switchboard, and the strap switchboard, or the switchboard in use in New Haven and Meriden, Conn., in 1878.

3. SAME.

Claim 2 of the Firman patent, No. 252,576, for "the combination of two or more multiple boards, to which the lines of the terminal stations are connected, and means are described whereby the switchman may readily ascertain what lines are in use," is void for want of novelty.

86 F.—49

**4. SAME—INFRINGEMENT.**
 The multiple switchboard described in claim 1 of the Perrin patent, No. 315,332, is substantially the same as the invention described in claim 1 of the Firman patent, No. 252,576; and its use, although in combination with the automatically operated visual indicator, is an infringement of that patent.

**5. SAME—INJUNCTION.**
 After a trial upon the merits in a case which puts in issue the validity of a patent and the question of an infringement, the complainant is entitled to a decree showing what issues were decided in his favor, and to an injunction against infringement, though defendants discontinued their infringement after the suit was commenced.

**6. DEPOSITIONS—TIME OF TAKING.**
 Depositions not taken within the time prescribed by equity rule 69 cannot be read in evidence, when timely objection is made.

Barton & Brown, George L. Roberts, and E. S. Pillsbury, for complainant.

John H. Miller, L. T. Hatfield, and C. C. Bulkley, for defendants.

DE HAVEN, District Judge. Upon the calling of this case for final hearing, the complainant moved to exclude from the record the deposition of Charles H. Aldrich, and certain documents printed in the defendants' record, and specifically referred to in the motion. The grounds of the motion, as stated, are:

"That said deposition was improperly and irregularly taken and filed, and is wholly irrelevant and immaterial, and that said documents were not proven, or properly offered, and are incompetent, irrelevant, and immaterial."

The deposition was not taken within the time prescribed or permitted by rule 69 (equity rules), and the complainant made this objection at the time of the taking of the deposition. The motion to exclude this deposition must therefore be granted, as the rule referred to is imperative, that testimony taken after the time prescribed shall not be read at the time of the hearing. Wooster v. Clark, 9 Fed. 854. Upon the other branch of the motion, nothing further need be said, than that some of the documents referred to are incompetent as evidence, not having been properly proven, and others are not relevant to the issues made by the pleadings, and one of them, the purported agreement between the American Bell Telephone Company and the Western Electric Company, does not appear to have been formally offered in evidence, nor accompanied by proof of its authenticity. The motion will be granted, and the defendants will be allowed an exception to this ruling.

Having disposed of this preliminary question, I proceed to the consideration of the case on the merits.

This is a suit in equity for an alleged infringement of patent No. 252,576, granted on January 17, 1882, to the Western Electric Manufacturing Company, as the assignee of Leroy B. Firman, who is alleged in the bill of complaint to have been the original and first inventor of the invention described in said letters patent, and entitled "Multiple Switchboard for Telephone Exchanges." The complainant asks for an injunction and an accounting. The defendants, in their answer, deny that Firman was the original or first inventor of the multiple switchboard, and, among other matters, allege that:

"On November 29, A. D. 1879, there was filed in the patent office of the United Kingdom of Great Britain and Ireland a provisional specification, and on the 28th

day of May, 1880, a complete specification, under patent No. 4,903, of the year 1879, granted to Charles E. Scribner, and sealed on May 14, 1880, fully disclosing and describing a system of multiple switchboards, in which the same telephone lines are connected to the first of the multiple switchboards, and thence to respectively corresponding blocks in the second, and so on through the series, so that any two of the lines can be connected together on either of the multiple switchboards as specified in the first and principal claim of the complainant's patent; thus anticipating and carrying into effect the useful functions which constitute the alleged grounds and meritorious feature upon which the complainant's patent was granted."

In respect to the alleged infringement the defendants aver:

"That they have never at any time made or sold any multiple switchboards of any kind, character, or description whatsoever; but the defendant corporation, the Capital Telephone & Telegraph Company, has used in its business of conducting a telephone exchange a multiple switchboard manufactured under, and distinctly claimed and patented and fully protected by, various and sundry letters patent of the United States granted to Thomas J. Perrin on the 7th day of April, 1885, and at other dates, and not in accordance with the description or claims of the complainant's patent, and that such multiple switchboard used by the defendant corporation follows the principles disclosed and described in the expired United States letters patent of Charles E. Scribner, and in said expired English patent of Charles E. Scribner, more nearly and closely than those defined and claimed in the complainant's patent."

The questions arising in the case have been carefully and elaborately presented in the evidence submitted, and also in the arguments of counsel.

1. The claim of the defendants that the alleged invention of Firman described in the patent issued to complainant was anticipated by the British patent, No. 4,903, issued to Charles E. Scribner, may be disposed of in a few words. While the latter patent antedates that of the patent in suit, still the evidence shows that Firman had reduced his alleged invention of the multiple switchboard to practice early in the year 1879, not later than March of that year, several months prior to the date of the Scribner patent, and also before the first step taken to secure that patent. This patent therefore cannot be held to anticipate the alleged invention of Firman.

2. It is, however, insisted by the defendants that, in view of the prior state of the art, there is a want of novelty in the alleged invention described in the patent in suit; that it exhibits nothing more than mechanical skill, and is a mere duplication of old devices; and that claim 2 of the patent is void because it is an aggregation of old devices, and not a legitimate combination. In order to clearly understand the force of these objections to its validity, it will be necessary to state with more particularity the nature of the alleged invention described in complainant's patent. The claims of the patent are:

"(1) The combination of two or more switchboards at the central office of a telephone exchange system, to each of which the same telephone lines are connected, whereby any two of these lines may be connected together upon either of the multiple switchboards. (2) The combination of two or more multiple boards, to which the lines of the terminal stations are connected, and means, as described, whereby the switchman may readily ascertain what lines are in use."

The device covered by complainant's patent is shown by the drawing filed with the specifications of the patent, and of which the following figure is a copy:

Fig. 1.

In the specifications filed by Firman, he sets forth the prior state of the art in this language:

"Prior to my invention the individual lines were grouped upon a single switch-board at the central office, or grouped upon two or more boards. In the latter case, trunk lines were used when it was necessary to connect a line of one board with a line of another board. A large exchange was thus divided up into a number of exchanges, which could be worked together, when occasion required, as one, by means of trunk lines between the boards. When the number of sub-scribers increased so that a single switchman could not do the amount of switching required, I gave the switchman an assistant. I soon found, however, that a single switchboard would not accommodate the number of attendants necessary to do the switching for an exchange of four or five hundred subscribers."

The specifications then proceed:

"I find, by the use of my new system of multiple switchboards, as hereinafter described, an exchange of a thousand or more subscribers may be successfully handled. My invention consists in providing two or more switchboards, instead of one, as heretofore, and so connecting the several lines therewith that any two lines can be connected on either of the boards, and also apparatus whereby attendants at a given board may, without delay, see what lines are connected at other boards than their own."

Then, after a reference to the multiple boards, and the manner in which the several telephone lines entering the exchange are connected with each of such boards, the specifications describe the apparatus, consisting of an indicator or dummy board, and its mode of operation, by means of which the attendants at the several switchboards can be made to see what lines are connected at other boards than their own. This is the description:

"The indicator or dummy board, B, is placed in sight of all the attendant switchmen. I prefer to arrange the multiple boards in line, and place the annunciator or dummy board centrally in front of them, so that an attendant, by looking back, can see the numbers upon the annunciator or dummy. There must be a number, or other target, corresponding to each subscriber's terminal plate or switch. * * * Suppose lines a and c are connected at multiple board, A, and lines b and d at multiple board, A', as shown by cords and plugs. The switchmen at the boards, immediately on making these connections, notify the attendant at the dummy, who thereupon hangs up the shields or targets, m, over the figures 1 and 3 and 2 and 4; and in the same manner, when any line is connected upon either of the multiple boards the figure which indicates its number is covered, and a switchman, by glancing at the dummy, sees what lines are

connected.  *  *  *  The dummy board or indicator should be large enough to accommodate targets or figures which may be readily distinguished by all of the switchmen.  Figures may be marked upon the shields or targets, and thus the lines in use may be determined by observing the numbers indicated by the figures upon the targets."

The question of the validity of claim 1 of the patent in suit will be first discussed.  As before stated, the defendants insist that this claim is without novelty; and, for the purpose of sustaining their contention, they offered evidence in relation to certain switchboards designed for, and used in, the operation of the electric telegraph prior to the alleged invention of Firman.  The telegraphic switchboards thus claimed to embrace the elements found in claim 1 of the complainant's patent are what is known as the "Dial Switchboard," described in the British patent, No. 13,487, granted to François M. A. Dumont, February 7, 1851, and the "Strap Switchboard."  It would serve no useful purpose to enter into a discussion of the evidence in relation to the structure or the manner of operating these telegraphic switchboards when it was desired that telegraph lines terminating at such boards should be connected.  The essential differences between each of these boards and the multiple boards referred to in claim 1 are pointed out in the testimony of the expert witnesses for the complainant, and need not be repeated here.  It is sufficient to say that I have given the evidence on this point careful consideration, and my conclusion is that neither of these switchboards can be said to be anticipatory of the multiple switchboard referred to in claim 1 of the patent in suit.  So, also, in regard to the telephone switchboard used in New Haven and Meriden, Conn., in the year 1878, and which is also claimed by the defendants to embody the subject-matter of claim 1 of complainant's patent.  That appears to have been a single switchboard, intended only for the accommodation of a small number of lines, and did not, in my opinion, in its construction or operation, involve the principle or conception of "the combination of two or more switchboards at the central office of a telephone exchange system, to each of which the same telephone lines are connected, whereby any two of these lines may be connected together upon either of the multiple switchboards," which is the invention set forth in claim 1 of the complainant's patent.

The patent itself, in referring to what is known as the "trunking system," sets forth the prior state of the art, which most nearly approaches the multiple system mentioned in claim 1; and the validity of this claim, when viewed in connection with the prior state of the art thus disclosed, will now be considered.  The trunking system consists of two or more independent switchboards, each being the terminal of lines of a separate group of subscribers; the boards being provided with trunk lines, by means of which the attendants can connect the lines terminating at different boards.  The manner in which this connection is made is thus described in one of the briefs filed for the defendants:

"When a subscriber in one group called for another subscriber in the same group, the switching was done by the old method used on the single switchboard. If, however, the subscriber called for did not happen to be in the group of the caller, but in another group on a separate board, then the connection was made

by connecting the calling wire with one end of the trunk line, and the called for wire with the other end, thus establishing electric connection between the two subscribers' wires by means of the intervening trunk line connecting the two boards."

Under this system, each switchboard is provided with an operator, and only those lines terminating upon a given board can be connected together directly by the operator at that board.    To connect two lines terminating at different boards, the services of the operators at both boards, or their attendants, are required; and, of course, more or less time would be consumed in making such connection.    In the multiple system, however, each switchboard is fully equipped with appliances with which to operate it; and each board contains terminals for all of the lines entering the exchange, so that any operator is enabled to make immediate connection between any two lines of the system, at any one of the switchboards, by the insertion of the two plugs into the two switches connecting the lines which are desired to be put in telephonic communication.    The evidence shows that switchboards operated in connection with trunk lines are adapted to give good service only to a limited number of subscribers entering a given exchange, and that the great advantage or utility of the multiple switchboard is found in exchanges where a large number of telephone lines are brought into a single central station.    It is urged that the arrangement and electrical connection between two or more switchboards which constitute the multiple system of switchboards covered by claim 1 of the patent exhibit nothing more than mechanical skill,—a simple duplication of old devices, with no novelty.    In support of this contention it is said, in substance, that by the trunking system the lines of subscribers terminating on independent boards could be connected, at the will of the operators, by means of the trunk line; that such was the result sought by the multiple system, and, to accomplish it, all that was done by Firman was to dispense with the trunk-line wire, and add a branch wire from each line entering the exchange to each of the multiple boards; and that the use of branch wires for the purpose of making electrical connections was not new, but, on the contrary, was well known to mechanics skilled in the construction and use of electrical appliances.    The question of novelty or invention is one of fact, and the line which separates what is termed "judgment" or "mechanical skill" from that which may be regarded as an act of invention is sometimes not easy to discern in a given case.    The solution of the question is not to be sought by considering separately the different elements entering into its structure, but the alleged invention is to be viewed as a whole, and with reference to what may be accomplished by its use.    In the language of Judge Cox in the case of Coupler Co. v. Pratt, 70 Fed. 624:

"Invention should be determined more by an ascertainment of what the inventor has actually accomplished, than by a technical analysis of the means by which the result is attained."

And substantially this same principle was declared by the supreme court of the United States in Loom Co. v. Higgins, 105 U. S. 591, in which case the court, speaking through Mr. Justice Bradley, said:

"It may be laid down as a general rule, though perhaps not an invariable one, that if a new combination and arrangement of known elements produce a new and beneficial result, never attained before, it is evidence of invention."

Measured by this rule, it would seem that the multiple system of switchboards described in claim 1 of the patent may be properly regarded as an invention. It is clear from the evidence that the result accomplished by its use, in the accommodation of a large number of lines entering one exchange, could not be attained under the trunking system, with the same number of operators and with the same number of switchboards. While the structural difference between the two may not be great, still there is a difference, and it is this difference which gives to the multiple system its increased utility and advantage over the other in the service of a large exchange. Nor does this invention consist simply in the duplication of the switchboards. The illustrations put by counsel of the use of two engines where one is unable to pull a train of cars, or the addition of a second instrument when one telegraphic instrument cannot receive all of the messages passing over the line, are not applicable. It is true that one section of the multiple board may be considered as the counterpart or duplicate of each of the other sections, but the organization of several sections or boards into a unitary system, acting in combination with each of a large number of telephone lines, and whereby any two lines entering the exchange may be connected on either of said boards, is something entirely different from the addition or duplication of independent switchboards for the purpose of accommodating additional and separate groups of subscribers. The invention appears now to be a very simple one indeed, but patents for inventions have been sustained in many cases where the novelty of the invention is not more apparent than in that under consideration here. Thus, in the case of Mast, Foos & Co. v. Dempster Mill Mfg. Co., 27 C. C. A. 191, 82 Fed. 333, it was held that the substitution of an internal toothed spur wheel for external toothed spur gear in the machinery of windmills, by combining the same with the pinion, pitman, and pump, constituted a patentable invention; and the court, in answer to objections somewhat similar to those urged by the defendants in this case, proceeded to say:

"Finally, the counsel for the appellee argue that there is no patentable novelty in the combination described in this claim, because internal toothed spur wheels were old and well known, and that the substitution of them for external toothed spur gear in the machinery of the windmills was nothing but a double use. This argument is always plausible and persuasive where old elements have been combined to produce a new or better result. Each element, taken by itself, has its old effect, and it is always difficult to understand how it was that the practiced eyes of skilled mechanics did not at once see and apply the necessary remedy to the troublesome evil which the invention removes."

In Potts v. Creager, 155 U. S. 597, 15 Sup. Ct. 194, the supreme court, after referring to the fact that it is frequently a difficult and delicate task to determine whether or not the application of an old device to the production of a new or better result rises to the dignity of an invention, said:

"And this is not the less true if, after the thing has been done, it appears to the ordinary mind so simple as to excite wonder that it was not thought of

before. The apparent simplicity of the new device often leads an inexperienced person to think that it would have occurred to any one familiar with the subject; but the decisive answer is that, with dozens and perhaps hundreds of others laboring in the same field, it had never occurred to any one before."

So, also, in the Barbed Wire Patent Case, 143 U. S. 275, 12 Sup. Ct. 443, 450, the supreme court of the United States held that it was an act of invention in Glidden to substitute a coiled wire barb for the diamond-shaped barb before patented by Kelley. The court in that case said:

"The difference between the Kelly fence and the Glidden fence is not a radical one, but, slight as it may seem to be, it was apparently this which made the barbed-wire fence a practical commercial success. * * * Under such circumstances, courts have not been reluctant to sustain a patent to the man who has taken the final step which has turned a failure into a success. In the law of patents, it is the last step that wins. It may be strange that, considering the important results obtained by Kelley in his patent, it did not occur to him to substitute a coiled wire in place of the diamond-shape prong, but evidently it did not; and to the man whom it did ought not to be denied the quality of inventor. There are many instances in the reported decisions of this court where a monopoly has been sustained in favor of the last of a series of inventors, all of whom were grouping to attain a certain result, which only the last one of the number seemed able to grasp."

It is not deemed necessary to cite other cases, as it is thought the foregoing sufficiently illustrate the rule by which courts are governed in passing upon the question of novelty or invention. As already indicated, my conclusion is that claim 1 of the patent in suit is valid.

3. Is claim 2 of complainant's patent valid? The defendants insist that it is not; the grounds of their contention being that it is not a true combination, but a simple aggregation of old elements. The language of this claim is as follows:

"The combination of two or more multiple boards, to which the lines of the terminal stations are connected, and means, as described, whereby the switchman may readily ascertain what lines are in use."

This claim is for a combination consisting of multiple boards, and certain "means" whereby the switchmen at these boards may readily ascertain what lines entering a telephone exchange are in use. The "means" here referred to as one part of the combination claimed is a dummy board, so placed that it can be seen by the operators at the multiple boards. It has upon its face numbers corresponding to those of the terminal plates or switches upon the multiple boards. There is placed over each one of these numbers on the dummy board a hook, upon which a target or shield may be hung. Thus hanging a target or shield over a number on the dummy board indicates that the line coming into the terminal plate having the same number on the switchboard is in use. There is no mechanical or electrical connection between the dummy board and the multiple switchboard. Each is under independent control, and the targets upon the dummy board are placed upon or taken off from the hooks by the attendant at that board, as directed by the operators at the multiple switchboard; that is to say, when the attendant at the dummy board is informed by an operator at the switchboard that certain numbered lines terminating at the switch-

board are engaged, the attendant notes the fact on the dummy board by hanging the targets or shields over the numbers on the dummy board corresponding to the numbers of the terminal plates of the lines in use.    We have in this only the act of one person registering upon an independent board what he has learned in relation to the present condition of certain lines entering the exchange, and terminating upon the multiple board.    There is certainly in this no joint action of the dummy board and the multiple switchboard,— no co-operation between them for the purpose of producing any common result.    The dummy board is indeed so manually operated by its attendant as to indicate what lines are connected upon the multiple switchboard, but that what is thus shown on the dummy board by the position of its targets or shields is not accomplished by reason of any co-operative action of the multiple board with the dummy board is obvious.    In my opinion, this claim does not disclose a patentable combination.    It was said by Mr. Justice Woods in delivering the opinion of the court in Stephenson v. Railroad Co., 114 U. S. 149, 5 Sup. Ct. 777, that:

"A combination is patentable only when the several elements of which it is composed produce, by their joint action, a new and useful result, or an old result in a cheaper or otherwise more advantageous way."

It is perhaps not necessary, in order to constitute a true combination, that each of its elements should co-act upon another, or that the action of the different parts of the combination should be simultaneous.    The rule upon this subject is well expressed in the following language by Hawley, J., in Standard Oil Co. v. Southern Pac. R. Co., 48 Fed. 109:

"What is the distinction between mere aggregation and a patentable combination?  A combination of well-known, separate elements, each of which, when combined, operate separately, and in its old way, and in which no new result is produced which cannot be assigned to the independent action of one or the other of the separate elements, is an aggregation of parts, merely, and is not patentable.  * * *  The parts need not act simultaneously, if they act unitedly to produce a common result.  It is sufficient if all the devices co-operate with respect to the work to be done, and in furtherance thereof, although each device may perform its own particular function only."

It is undoubtedly true that the utility of the multiple switchboard, as described in claim 1 of the patent in suit, is greatly increased by reason of the fact that it is possible for operators to be informed when certain lines are connected, so that the otherwise frequent interconnection of a third with two lines already in use can be avoided; but it by no means follows from this consideration that the means for giving such information, referred to by Firman in claim 2, constituted a patentable invention.    There was certainly nothing new or novel in the dummy board, with its hooks and targets; and such board was not placed by him in combination with the multiple switchboard, so as to produce any new or novel result. My conclusion is that this claim of the patent is invalid.

4. The defendants, in their answer, allege that the multiple switchboards put in operation by the defendant, the Capital Telephone & Telegraph Company, were patented, and are protected by sundry letters patent granted to Thomas J. Perrin on the 7th day

of April, 1885. The Perrin patents referred to are respectively
numbered 315,331, 315,332, and 315,333, and it appears that all the
inventions patented thereby contain the principle which is thus de-
scribed in the first claim of the Perrin patent numbered 315,332:

"(1) The combination, in a multiple switchboard, of a series of main lines, the
terminal or connection where each of said main lines enters each switchboard,
and a visual indicator at each of said terminals or connections on each board;
the visual indicators of each line being automatically operated on all the boards
whenever any terminal of said line is plugged."

That such multiple switchboard is substantially the same as the
invention described in the first claim of the patent in suit is clearly
shown by the evidence; and, such being the fact, its use, although
in combination with the automatically operated visual indicator
mentioned in the claim just quoted, would constitute an infringe-
ment of claim 1 of complainant's patent. It appears from the evi-
dence that these infringing multiple switchboards were first in-
stalled by the Capital Telephone & Telegraph Company, one of the
defendants herein, in the month of July, 1895, and were thereafter
only used to a limited extent by that company in rendering tele-
phone service to its subscribers, and for which service it made no
charge, because only a small number of lines were in operation, and
its system had not been so far completed as to warrant a charge to sub-
scribers for the use of the lines in operation, when, on October 17,
1895, the complainant gave notice to the defendant company that
such multiple switchboards were an infringement of complainant's
patent, and requested the defendant to discontinue their use. The
defendant company made no reply to this request, but, upon the
next day after receiving it, commenced to change from the use of
the multiple system of switchboards to that of the trunking system;
completing the change on the 31st day of October, 1895, about one
week after the filing of complainant's bill of complaint. The de-
fendants contend that, even though the court should be of opinion
that upon these facts there was an infringement of complainant's
patent, the bill should be dismissed, because such infringement has
ceased, and future infringement is not threatened by them. This
contention is less plausible than novel. In their pleadings and
proofs the defendants have sought to justify their acts, and have
also put in issue the validity of complainant's patent. The case
has been fully heard upon the issues thus presented, and as the
complainant has established the validity of claim 1 of the patent in
suit, and the fact of its infringement, it is entitled to an injunction
restraining the defendants from infringing claim 1 of its patent, by
the use of the Perrin multiple switchboards, or otherwise. In the
case of Potter v. Crowell, Fed. Cas. No. 11,323, 3 Fish. Pat. Cas. 112,
it was held that the discontinuance of an infringement after the
commencement of a suit was not of itself sufficient to defeat an
application for an injunction pendente lite. The court in that case
said:

"Perhaps as safe a criterion of what is to be apprehended from defendants as
can be obtained is to look at that which they have done, and in their answer
justify the right to do, rather than to look to the fact of their having discon-
tinued the alleged injury, and their declaration of want of intention of renewing

the same. The court is not prepared to say that no occasion for the exercise of its restraining power is shown in this case, when it is apparent that there was such occasion when the suit was commenced; that it has but recently ceased; that it may, if defendants feel disposed, be renewed at any time; and that the complainants claim that they apprehend a continuance of the wrong.   *   *   * Nevertheless, upon principle, it seems to the court that the right to protection which existed when this cause was commenced ought not to be defeated by anything which has thus far been asserted on behalf of the defendants, particularly as no injury can possibly result to defendants, while the allowance of the motion will insure protection to complainants."

What was said by the court in the quotation just made applies with still greater force when the question arises, as it does here, after a trial has been had upon the merits, and upon pleadings which put in issue the right of complainant to any relief.   In such a case a complainant is entitled to a decree showing what issues have been determined in his favor, and one, also, which will prevent any future invasion of his rights by a defendant.   The complainant is entitled to a decree in accordance with the foregoing opinion, restraining the defendants from infringing upon claim 1 of the patent in suit, by the use of the Perrin multiple switchboards, or otherwise, and for an accounting, unless the accounting shall be waived by it.   Let such a decree be entered.